Marie Lisette Garcia VEGA, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–98–044–CR.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Aug. 9, 2007.

Discretionary Review Refused
Jan. 16, 2008.

Rehearing Overruled Sept. 20, 2008.

Joseph Leo Lanza, Houston, for appellant.

Rene A. Guerra, Crim. Dist. Atty., Theodore C. Hake, Asst. Crim. Dist. Atty., Edinburg, for state.

Before Justices YAÑEZ, RODRIGUEZ, and HINOJOSA.[1]

## OPINION ON REMAND

RODRIGUEZ, Justice.

Appellant, Marie Lisette Garcia Vega, a juvenile, was tried as an adult in Hidalgo County. A jury found her guilty of the offenses of capital murder, aggravated kidnaping, and aggravated robbery. Because the State did not seek the death penalty for the capital murder, the trial court assessed her punishment at life imprisonment for capital murder. The jury assessed punishment at twenty years' imprisonment for aggravated kidnaping and twenty years' imprisonment for aggravated robbery. On remand, we affirm.

### I. Background

In late December 1994, Vega, who was sixteen at the time, and her boyfriend, nineteen-year-old Jaime Nonn, were implicated in a capital murder in Starr County, Texas. They had fled to Chicago, Illinois. On December 28, 1994, Vega and Nonn were arrested by the Chicago police after Starr County deputies advised the Chicago Police Department that Texas warrants had been issued for the two suspects. Both Nonn[2] and Vega gave statements in Illinois. The trial court overruled Vega's motion to suppress the written statement she made to the Illinois authorities.

On direct appeal following the convictions, Vega raised eighteen issues, thirteen of which complained of the trial court's admission of her written statement obtained in Illinois by Illinois law enforcement officers. Vega also complained that the trial court erred by admitting evidence of extraneous offenses and giving an inappropriate limiting instruction regarding the extraneous offenses. Relying on *Davidson v. State*, 25 S.W.3d 183 (Tex.Crim.App. 2000) (en banc), a panel of this Court held that the trial court abused its discretion when it admitted Vega's Illinois statement into evidence. *See Vega v. State*, 32 S.W.3d 897, 906 (Tex.App.-Corpus Christi 2000), *reversed and remanded*, 84 S.W.3d 613 (Tex.Crim.App.2002) (en banc). We reversed all three judgments of the trial court and remanded for a new trial. *Id.*

On the State's petition for discretionary review, the Texas Court of Criminal Ap-

---

1. Justice Federico G. Hinojosa, Jr., whose term ended on December 31, 2006, not participating.

2. Nonn was later convicted, and his conviction was upheld by this Court and the court of criminal appeals. *See Nonn v. State*, 117 S.W.3d 874, 875, 883 (Tex.Crim.App.2003) (setting out history of case and affirming).

peals held that this case is not a *Davidson* case by statute, circumstances, or command to "strictly construe," and that *Davidson* is inapplicable here.[3] *Vega v. State*, 84 S.W.3d 613, 616 (Tex.Crim.App. 2002) (en banc). The court also concluded that "[b]ecause appellant was a juvenile at the time she gave her statement, its admissibility must be determined under Title 3 of the Family Code." *Id.* And we are not to "strictly" construe Title 3 because the legislature did not so mandate. *Id.* Additionally, although Vega and the State take the position that the issue on remand is the review of the fairness factor in a conflict-of-laws analysis, we believe that the court of criminal appeals has decided that issue. In its opinion, the court determined that procedural issues in this case were governed by the law of Texas, the forum state, and that substantive issues were also governed by Texas law because the conflict-of-law schemes of both Illinois and Texas militate for such application.[4] *See id.* at 617; *see also id.* at 621 (Keller, J., dissenting).

The court of criminal appeals remanded this case for an analysis, but not for our analysis of how fairness should be factored into a conflict-of-laws analysis. Rather, we have been charged to analyze how the absence of a magistrate impacts the fairness to the parties, with our focus being on the purpose expressed in section 51.01 of the family code: "to provide a simple judicial procedure through which the provisions of this title are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized

**3.** The *Vega* Court summarized its holding in *Davidson* as follows:

> [B]ecause art. 38.22 § 3(a) of the Texas Code of Criminal Procedure was procedural in nature, a trial judge is required to apply Texas law to determine the admissibility of an oral confession obtained in another state. [The *Davidson* Court] also held that because the mandatory requirement of art. 38.22 § 3(a), that an oral custodial statement must be recorded before it can be used against a defendant, was not followed by the authorities in Montana, appellant's oral confession was inadmissible at his Texas trial.

*Vega v. State*, 84 S.W.3d 613, 616 (Tex.Crim. App.2002) (en banc) (citing *Davidson v. State*, 25 S.W.3d 183, 185–86 n. 2 (Tex.Crim.App. 2000)). In *Vega*, the court of criminal appeals concluded *Davidson* did not apply because (1) the challenged statement was written and, thus, did not violate the provisions of article 38.22, and (2) "pursuant to the Code Construction Act, the sections of the Family Code relevant to confessions prevail over art[icle] 38.22." *Id.*

**4.** The court of criminal appeals reasoned that the question of which directives in Title 3 are substantive and which are procedural is not relevant because, if procedural in nature, the issues are governed by the laws of the forum state, or Texas in this instance, and, if substantive in nature, the conflict-of-law schemes of both Illinois and Texas militate for the application of Texas substantive law. *See Vega*, 84 S.W.3d at 617. The court arrived at its Texas substantive law conclusion by considering five factors Texas courts review in determining which forum has the most significant relationship to the case and by deciding that four of the five factors, including (1) where the injury or unlawful conduct occurred, (2) the place where the relationship between the parties is the strongest, (3) the number and nature of contacts that the non-forum state has with the parties and with the transaction involved, and (4) the relative materiality of the evidence that is sought to be excluded, favor Texas law, and that only resolution of the issue of fairness, the fifth factor, was not obvious. *See id.* (citing Restatement (Second) of Conflict of Laws §§ 6,145 (1971)); *Gonzalez*, 45 S.W.3d 101, 104 n. 4 (Tex.Crim. App.2001) (citing Restatement (Second) of Conflict of Laws § 139 (1971)). Because Illinois has a similar method of determining which state has the most significant relationship to the case, the court of criminal appeals determined that all of the Illinois factors also favored application of Texas law to the substantive issues. *See id.*

and enforced."[5] *Id.* at 619; *see* Acts 1973, 63rd Leg., p. 1460, ch. 554, § 1, eff. Sept. 1, 1973 (current version at Tex. Fam.Code Ann. § 51.01(6) (Vernon 2002)).

As stated in our original opinion,

[t]his appears to be a case of first impression in the state of Texas. This case presents the issue of whether a sister state's law enforcement officers must adhere to Texas's scheme of processing juvenile offenders for a statement taken by those officers to be admissible against the juvenile in a Texas court.

*Vega,* 32 S.W.3d at 900. On remand, however, as directed by the court of criminal appeals, we will not apply *Davidson;* we will apply Texas law—specifically, Title 3 of the Texas Family Code—but we will not apply it strictly; and we will analyze fairness to the parties focusing on the purpose of section 51.01.

## II. Admissibility of Vega's Written Illinois Statement

In her first thirteen issues, Vega argues that, because her written statement was not procured in conformance with the Texas Family Code, it should have been ex-cluded. The trial court denied Vega's motion to suppress her statement.

### A. Standard of Review

When reviewing a trial court's ruling on a motion to suppress, we give almost total deference to a trial court's determination of facts supported by the record and its rulings on application of law to fact, or "mixed" questions of law, when those fact findings involve an evaluation of the credibility and demeanor of witnesses. *Maestas v. State,* 987 S.W.2d 59, 62 (Tex. Crim.App.1999); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997) (en banc). However, we review *de novo* mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Maestas,* 987 S.W.2d at 62; *Guzman,* 955 S.W.2d at 89. In this case, because there is no disagreement about the facts surrounding Vega's statement given to the Chicago police or the credibility of the witnesses in this case, the trial court's ruling on these matters did not involve an assessment of the credibility and demeanor of the witnesses. *See Ramirez v. State,* 44 S.W.3d 107, 109 (Tex.App.-Austin 2001, no pet.). Therefore, we will conduct a *de*

---

5. In 1994, section 51.01 read as follows:
This title shall be construed to effectuate the following public purposes:
(1) to provide for the care, the protection, and the wholesome moral, mental, and physical development of children coming within its provisions;
(2) to protect the welfare of the community and to control the commission of unlawful acts by children;
(3) consistent with the protection of the public interest, to remove the children committing unlawful acts the taint of criminality and the consequences of criminal behavior and to substitute a program of treatment, training, and rehabilitation;
(4) to achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only

when necessary for his welfare or in the interest of public safety and when a child is removed from his family, to give him the care that should be provided by parents; and
(5) to provide a simple judicial procedure through which the provisions of this title are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.
Acts 1973, 63rd Leg., p. 1460, ch. 554, § 1, eff. Sept. 1, 1973 (current version at Tex. Fam.Code Ann. § 51.01 (Vernon 2002)). The court of criminal appeals asks only that we focus on subsection (5). *Id.* Therefore, we will limit our review to the purpose expressed in that subsection.

*novo* review of the denial of Vega's motion to suppress.

### B. Analysis

#### 1. Issues Determined by the Court of Criminal Appeals

Before remanding to this Court, the court of criminal appeals examined issues one, two, three, four, eight, and twelve—Vega's complaints regarding the facility in which she was detained, unauthorized officers making detention decisions, and warnings allegedly not given. *See Vega*, 84 S.W.3d at 615–18. Generally, as to these issues, the court determined that "[i]t is undisputed that, while correct under Illinois law, the procedures followed in obtaining [Vega's] statement, as well as the format of the statement itself, were not in compliance with Title 3 of the Texas Family Code." *Id.* at 615. However, "Illinois authorities, by following Illinois law, also complied with Texas law to the extent necessary to carry out Texas's intended purpose and public policy." *Id.* at 618. Finding compliance, the court of criminal appeals decided in the State's favor on issues one, two, three, four, eight, and twelve.

More specifically, by issues one, two, and eight, Vega complained of the Illinois facility where she was detained, urging violations of sections 52.02, 52.025, and 51.12.[6] Vega contended that she was not taken without unnecessary delay to a place designated in this code section, that the Chicago police failed to interview her in an approved juvenile processing office, and that she was not detained in a facility approved by Texas authorities. Address-

ing these issues, the court of criminal appeals noted that Vega was taken to an equivalent Illinois facility and concluded that "[t]o hold that such actions were not sufficient to satisfy Texas's concerns would make impossible any apprehension of a Texas juvenile offender any place outside of Texas and would not advance Texas public policy as expressed in § 51.01." *See id.* at 617–18.

By her third issue, Vega urged that the Chicago police failed to have an authorized officer of the Texas juvenile court decide whether Vega should be further detained. *See id.* at 618. The court of criminal appeals found, however, that there is no such requirement in the Texas Family Code. *See id.* It concluded the "Chicago police arrested [Vega] under a Texas warrant that included a no-bond condition," and, thus, "Illinois authorities had no discretion to release her." *Id.* (citing 705 Ill. Comp. Stat. 405/5–8 (1994)).

In issue four, Vega contended that her written statement did not contain all of the warnings required by section 51.09.[7] However, the court of criminal appeals found that Vega did receive the warnings, essentially the *Miranda* warnings, at least three times. *Id.* Additionally, she "was informed of Illinois law, which while technically incorrect, accurately conveyed the possibility of being treated as an adult when accused of murder." *Id.*

Finally, in issue twelve, Vega complained that she was detained in an area where adults arrested for, or charged with, a crime are detained, in violation of section 51.12.[8] From the language of the statute, the court of criminal appeals determined

---

6. Now Tex. Fam.Code Ann. § 52.02(a) (Vernon Supp.2006), §§ 52.025 & 51.12 (Vernon 2002).

7. Now Tex. Fam.Code Ann. § 51.095 (Vernon Supp.2006).

8. Now Tex. Fam.Code Ann. § 51.12(a) (Vernon 2002).

that "[a] reasonable inference is that the legislature intended to prohibit putting a juvenile into circumstances in which the juvenile might be victimized by adult offenders." *Id.* "Vega was held in an interrogation room. She was at all times kept separate from adult offenders." *Id.*

Having been resolved by the court of criminal appeals, these issues are not now before this Court.

### 2. Issues Remanded by the Court of Criminal Appeals

The court of criminal appeals has remanded the following issues for our review:

Issue five: Vega's written statement does not contain a certificate by a magistrate that Vega knowingly, intelligently and voluntarily waived her rights before making the statement as required by section 51.09;[9]

Issue six: Vega was never advised of her rights by a magistrate before being interrogated as set out in section 51.09;[10]

Issue seven: Vega was never presented before a magistrate at any time before giving her statement as provided for in section 51.09;[11]

Issue nine: Vega was detained for more than six hours before the conclusion of her statement in violation of section 52.025;[12]

Issue ten: Vega's statement was not signed in the presence of a magistrate with no law enforcement officer present as required by section 51.09;[13]

Issue eleven: Vega's statement was signed in the presence of at least one law enforcement official who was armed in violation of section 51.09;[14] and

Issue thirteen: Vega was improperly left unattended in the interview in violation of section 52.025.[15]

In remanding these issues, the court of criminal appeals determined that the following circumstances violated provisions of Title 3:

Vega arrived at the police station at about 10:45 a.m. Her written statement was signed at about 9:40 p.m. As permitted by Illinois law, the youth officer who presided at the signing was an armed police officer. Vega was left alone in the interrogation room for several periods before she was taken to the juvenile holding facility. From the record at hand, it appears that Vega was not taken before a magistrate.

*Vega*, 84 S.W.3d at 618. The court further concluded, however, that a violation of the family code, in this particular case, did not necessarily dispose of the issue of admissibility. *Id.*

#### a. Absence of a Magistrate

We first address the five issues that complain of the absence of a magistrate—issues five, six, seven, ten, and eleven.[16]

---

**9.** Now Tex. Fam.Code Ann. § 51.095(a)(1)(D) (Vernon Supp.2006).

**10.** Now Tex. Fam.Code Ann. § 51.095(a)(1)(A) (Vernon Supp.2006).

**11.** Now Tex. Fam.Code Ann. § 51.095(a)(1)(A)-(C) (Vernon Supp.2006).

**12.** Now Tex. Fam.Code Ann. § 52.025(d) (Vernon 2002).

**13.** Now Tex. Fam.Code Ann. § 51.095(a)(1)(B)(i) (Vernon Supp.2006).

**14.** Now Tex. Fam.Code Ann. § 51.095(a)(1)(B)(i) (Vernon Supp.2006).

**15.** Now Tex. Fam.Code Ann. § 52.025(c) (Vernon 2002).

**16.** Issues nine and thirteen involve violations of section 52.025 of the family code and will be addressed separately.

The version of section 51.09 in effect at the relevant time provided in part:

(a) Unless a contrary intent clearly appears elsewhere in this title, any right granted to a child by this title or by the constitution or laws of this state or the United States may be waived in proceedings under this title if:

(1) the waiver is made by the child and the attorney for the child;

(2) the child and the attorney waiving the right are informed of and understand the right and the possible consequences of waiving it;

(3) the waiver is voluntary; and

(4) the waiver is made in writing or in court proceedings that are recorded.

(b) Notwithstanding any of the provisions of Subsection (a) of this section, the statement of a child is admissible in evidence in any future proceeding concerning the matter about which the statement was given if:

(1) when the child is in a detention facility or other place of confinement or in the custody of an officer, the statement is made in writing and *the statement shows that the child has at some time prior to the making thereof received from a magistrate a warning* that:

(A) the child may remain silent and not make any statement at all and that any statement the child makes may be used in evidence against the child;

(B) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;

(C) if the child is unable to employ an attorney, the child has the right to have an attorney to counsel with the child prior to or during any interviews with peace officers or attorneys representing the state;

(D) the child has the right to terminate the interview at any time;

(E) if the child is 15 years of age or older at the time of the violation of a penal law of the grade of felony the juvenile court may waive its jurisdiction and the child may be tried as an adult;

(F) the child may be sentenced to commitment in the Texas Youth Commission with a transfer to the institutional division of the Texas Department of Criminal Justice for a term not to exceed 30 years if the child is found to have engaged in delinquent conduct, alleged in a petition approved by a grand jury, that included:

(1) murder;

(2) capital murder;

(3) aggravated kidnaping;

(4) aggravated sexual assault;

(5) deadly assault on a law enforcement officer, corrections officer, court participant or probation personnel; or

(6) attempted capital murder; and

(G) *the statement must be signed in the presence of a magistrate by the child with no law enforcement officer or prosecuting attorney present, except that a magistrate may require a bailiff or a law enforcement officer* if a bailiff is not available to be present if the magistrate determines that the presence of the bailiff or law enforcement officer is necessary for the personal safety of the magistrate or other court personnel, provided that *the bailiff or law enforcement officer may not carry a weapon in the presence of the child. The magistrate must be fully convinced that the child understands the nature and contents of the statement and that the child is signing the same voluntarily. If such a statement is taken, the magistrate shall sign a written statement verifying the foregoing requisites have been met.*

*The child must knowingly, intelligently and voluntarily waive these rights prior to and during the making of the statement and sign the statement in the presence of a magistrate who must certify that he has examined the child independent of any law enforcement officer or prosecuting attorney,* except as required to ensure the personal safety of the magistrate or other court personnel, *and has determined that the child understands the nature and contents of the statement and has knowingly, intelligently and voluntarily waived these rights.*

Act of May 22, 1991, 72nd Leg., ch. 429, § 1, eff. Sept. 1, 1991; Act of May 24, 1991, 72nd Leg., ch. 557, § 1, eff. Sept. 1, 1991; Act of May 27, 1991, 72nd Leg., ch. 593, § 1, eff. Aug. 26, 1991 (emphasis added) (current version at Tex.Code Crim. Proc. Ann. § 51.09 (Vernon 2002), § 51.095 (Vernon Supp.2006)).

On remand, the court of criminal appeals has directed this Court to analyze the effect of the absence of a magistrate on the admissibility of the challenged statement in a context of fairness to the parties, focusing on the purpose expressed in section 51.01 of the family code, which is "to provide a simple judicial procedure through which the provisions of this title are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced." *Vega,* 84 S.W.3d at 619 (quoting Acts 1973, 63rd Leg., p. 1460, ch. 554, § 1, eff. Sept. 1, 1973).

Our analysis begins with the word, "fair." It is not defined by statute; therefore, we must give the language its plain and ordinary meaning. *See* Tex. Gov't Code Ann. § 312.002(a) (Vernon 2005); *In re Kasschau,* 11 S.W.3d 305, 311 (Tex. App.-Houston [14th Dist.] 1999, no pet.);

*Nevarez v. State,* 767 S.W.2d 766, 768 (Tex. Crim.App.1989) (en banc). Black's Law Dictionary defines "fair" as "1. Impartial; just; equitable; disinterested," and "2. Free of bias or prejudice." Black's Law Dictionary 505 (8th ed.2004). The Supreme Court of Wyoming clarifies the definition by comparing "fair" with the following similar terms:

> FAIR, the most general of the terms, implies a disposition in a person or group *to achieve a fitting and right balance of* claims or *considerations* that is free from undue favoritism even to oneself, or implies a quality or result in an action befitting such a disposition.
> * * * * * *
> JUST stresses, more than FAIR, a disposition to conform with or conformity with the standard of what is right, true, or lawful, despite strong, esp. personal, influences tending to subvert that conformity ... (a just statement of the facts)....
> * * * * *
> IMPARTIAL stresses an absence of favor or prejudice in judgment.

*Casteel v. News–Record, Inc.,* 875 P.2d 21, 24 (Wyo.1994) (emphasis added) (citing Webster's Third New International Dictionary (1971)). The ordinary and obvious meaning of fair does not require that the process, which in this case is the process utilized to obtain Vega's statement, be precise or accurate. *See id.* (concluding that the meaning of fair does not require the report to be true or accurate). What is required is that the process have the qualities of impartiality and honesty. *See id.* It is a process that is free from prejudice, favoritism, and self-interest. *See id.* These parameters help define what is a fitting and right balance of considerations. Therefore, determining fairness to Vega and the State, we ask whether the process of taking Vega's statement in Illinois in the

absence of a magistrate was exercised and enforced in a manner that achieved a fitting and right balance of considerations such that both parties were assured a fair hearing where the parties' legal rights were recognized and enforced.

In order to identify Vega's considerations, we must review the responsibilities of the magistrate as set out in section 51.09 of the family code.[17] Under section 51.09, the magistrate is to ascertain whether the accused juvenile wishes to waive her constitutional rights. *Hill v. State,* 78 S.W.3d 374, 386 (Tex.App.-Tyler 2001, pet. ref'd). Section 51.09 provides that the magistrate must provide appropriate warnings to the juvenile before the making of the statement.[18] *See* Act of May 22, 1991, 72nd Leg., ch. 429, § 1, eff. Sept. 1, 1991; Act of May 24, 1991, 72nd Leg., ch. 557, § 1, eff. Sept. 1, 1991; Act of May 27, 1991, 72nd Leg., ch. 593, § 1, eff. Aug. 26, 1991. The statement must be signed in the presence of the magistrate with no law enforcement officer or prosecuting attorney present except for a bailiff or law enforcement officer who is unarmed, if the magistrate determines it necessary. *Id.; see Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("The authority of an armed, uniformed officer exerts some pressure to respond to questions."); *Ancira v. State,* 516 S.W.2d 924, 926 (Tex.Crim.App.1974) (holding that potential for compulsion existed when an armed officer interviewed a suspect who was detained inside a police vehicle). Additionally, the magistrate must certify that she has determined "that the child under-

stands the nature and contents of the statement and has knowingly, intelligently, and voluntarily waived these rights." *See* Act of May 22, 1991, 72nd Leg., ch. 429, § 1, eff. Sept. 1, 1991; Act of May 24, 1991, 72nd Leg., ch. 557, § 1, eff. Sept. 1, 1991; Act of May 27, 1991, 72nd Leg., ch. 593, § 1, eff. Aug. 26, 1991.

Therefore, under section 51.09, Vega's considerations involve her legal right to have her constitutional rights thoroughly explained so that any waiver of those rights is made voluntarily and uncoerced, and knowingly and intelligently.[19] *See id.* An additional consideration under section 51.09 is to reduce the impact of armed law enforcement personnel on Vega. *See id.* Also, under section 51.01, Vega's considerations include being assured that a fair hearing will result from the simple judicial procedure through which this statutory right is recognized, executed, and enforced. *See* Acts 1973, 63rd Leg., p. 1460, ch. 554, § 1, eff. Sept. 1, 1973.

### (1) Voluntary and Uncoerced

 A voluntary statement is the product of a free and deliberate choice rather than intimidation, coercion, or deception. *See Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). A court must examine the totality of the circumstances surrounding the interrogation to determine if a confession was voluntary and uncoerced. *See id.; Ashcraft v. State,* 934 S.W.2d 727, 738 (Tex.App.-Corpus Christi 1996, pet. ref'd).

---

17. For convenience, we will refer only to section 51.09 as it was written at the time Vega gave her statement.

18. In reviewing Vega's fourth issue, the court of criminal appeals determined that the warnings Vega received were sufficient to comply with Texas law to the extent necessary to carry out Texas's intended purpose and public

policy. Therefore, we do not address the sufficiency of the *Miranda* warnings; rather, we address the absence of a magistrate during the warnings.

19. While arguing that provisions of the family code were violated, Vega does not contend that her constitutional rights were violated.

At the motion to suppress hearing, Detective Gregory Biochi testified that he issued *Miranda* warnings to Vega during her first interview with law enforcement officers at 12:45 p.m. Vega did not ask for an attorney or seek to remain silent; instead, she agreed to talk. Assistant State's Attorney Michael Falagario interviewed Vega at 3:30 p.m. ASA Falagario testified that he advised Vega of her rights and explained that he was a prosecutor, an attorney assisting the police, and not Vega's attorney. Vega said that she understood who he was. ASA Falagario testified that he spoke to Vega alone to make sure she was being treated "okay," that she did not need anything, and that she had no complaints. He explained to Vega the possibilities concerning giving a statement. Vega said that she had been treated well, and agreed to give a handwritten statement. After Vega agreed to make a statement, ASA Falagario left the interview room in order to take a statement from Nonn and did not return until 7:30 p.m. when he took Vega's statement.

Chicago Police Youth Officer Linda Paraday introduced herself to Vega at approximately 4:00 p.m. and read Vega her rights. Youth Officer Paraday also informed Vega that she would be tried as an adult. Vega replied that she had heard those warnings before. Youth Officer Paraday talked with Vega while they waited for ASA Falagario, and she explained to Vega that she was there for her if she needed anything. Youth Officer Paraday testified that she wore a weapon under her blazer, but it was not visible to Vega.

When ASA Falagario returned to the interview room at 7:30 p.m., he again asked Vega if she wanted to give a statement. Vega indicated that she wanted to give a handwritten statement. ASA Falagario read the written warnings on the statement form to Vega, and he also included the warning that she would be tried as an adult. Vega never said that she wanted to remain silent or asked for an attorney and, instead, agreed to talk to the prosecutor. ASA Falagario explained that he was going to write down what Vega was saying as she told him what had happened. He also told Vega he would make any changes, corrections, or additions she wanted. The following written warnings were given:

> I understand that I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford to hire a lawyer one will be appointed by the court to represent me before any questioning. I understand that although I am 16 years [sic] I will be tried as an adult.

Understanding these rights, I wish to give a statement.

After saying that she understood the above warnings and wanted to make a statement, Vega signed on the line below the warnings. ASA Falagario wrote out Vega's statement as Vega told him what happened. Youth Officer Paraday, who was present when Vega made her statement, noted that a detective interrupted the taking of the statement to inform them that Vega's mother had called. The State's attorney asked Vega if she wanted to talk to her mother, and, after Vega said that she wanted to do so, Youth Officer Paraday took Vega to a phone. Vega did not ask to stop or to be given an attorney after talking with her mother. She, instead, continued with the statement.

When ASA Falagario finished writing the statement, Vega read the warnings and the first paragraph of the statement aloud. ASA Falagario read the rest of the statement as Vega followed along. Vega

requested changes and corrections to the statement, which ASA Falagario made. After Vega was satisfied with the changes and corrections, she signed each page of the statement. Youth Officer Paraday testified that no one used any tricks, coercion, or promises to get Vega to sign the statement.

Considering all of the testimony in the record, the totality of the circumstances surrounding Vega's interrogation suggests that her statement was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *See Moran*, 475 U.S. at 421, 106 S.Ct. 1135. Vega's rights were explained to her. In addition, before making her statement, Vega was read the written warnings on the statement, stated that she understood the warnings, and signed on the line below the warnings. Vega never invoked her right to remain silent or to seek counsel. ASA Falagario and Youth Officer Paraday testified that they each spoke with Vega privately and asked if she was being treated okay and if she needed anything. During these discussions, Vega did not make any indication that she was treated unfairly or was coerced in any way. Vega was also allowed to speak with her mother before signing the statement. Furthermore, because Youth Officer Paraday's weapon was not visible to Vega, its presence during the making of the statement does not suggest coercion. Accordingly, we conclude that Vega's statement was voluntary and uncoerced.

### (2) Knowingly and Intelligently

■ To knowingly and intelligently abandon a constitutional right, the accused must be aware of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See id.* A court must examine the totality of the circumstances surrounding the interrogation to determine if the accused had the requisite level of comprehension to knowingly and intelligently abandon a constitutional right. *See id.; Ashcraft*, 934 S.W.2d at 738.

In addition to the facts set out above, Youth Officer Paraday testified that Vega appeared very bright and rather calm and matter-of-fact. Vega indicated that she understood the warnings. She also had the opportunity to read warnings aloud before she signed the statement.

Considering all of the testimony in the record, the totality of the circumstances surrounding the interrogation suggests that Vega was aware of both the nature of the rights that she abandoned and the consequences of the decision to abandon those rights. *See Moran*, 475 U.S. at 421, 106 S.Ct. 1135. We therefore conclude that Vega made her statement knowingly and intelligently.

■ Accordingly, Vega's legal rights were explained to her so that her statement was made voluntarily, uncoerced, knowingly, and intelligently. We cannot conclude that Vega's considerations were affected by the absence of a magistrate. The procedures utilized were sufficient to carry out the underlying purpose of the Texas requirements. We therefore conclude that Vega's constitutional and other legal rights were recognized and enforced, and she was assured a fair hearing as directed by section 51.01 of the family code.

Vega contends that Texas law enforcement officers should have explained the provisions of the Texas Family Code to the Illinois authorities so that they would employ the correct procedures. However, this would have placed an extreme burden on the Texas and Illinois authorities. Out-of-state law enforcement personnel are not expected to learn and apply the intricacies

of Texas statutory law or vice versa. It would be nearly impossible for Texas authorities to fully explain the necessary procedures to be followed when questioning a juvenile to authorities in every state that may apprehend a juvenile for a crime committed in Texas. Also, Texas law enforcement officers have no control over the actions of authorities in other states. Finally, as noted by the court of criminal appeals, since the identified violations of the Texas Family Code were committed by Illinois law enforcement officers, excluding Vega's statement would not deter Illinois law enforcement officers from future violations because the Illinois police will continue to comply with their own laws and procedures. *See Vega,* 84 S.W.3d at 619 (citing *State v. Mayorga,* 901 S.W.2d 943, 946 (Tex.Crim.App.1995)). A ruling that the statement was properly admitted is most consistent with principles of "fairness" to all involved. The circumstances surrounding the taking of Vega's statement, although in violation of Texas statutes, upheld the constitutional rights the Texas procedures were designed to protect.

Vega argues that the Texas officials should have advised the Illinois authorities of Texas's procedures for taking juvenile statements. This ignores a number of practical concerns at the time, including the lack of any clear precedent concerning which state's procedures should apply. She asserts that said officers should have so analyzed a complex legal issue that this Court is still reviewing. This argument also ignores significant practical concerns, such as the need to not only decide that Texas law applies, but rather to also convince the Illinois authorities, including a magistrate, to follow Texas law rather than Illinois law. It also does not recognize that an Illinois magistrate would have had to educate himself concerning the role a magistrate plays under Texas juvenile law and

also that the magistrate and everyone else involved would have had to then properly carry out their unfamiliar role under said law.

Vega contends that a plain reading of section 51.09 evinces a desire by the legislature to protect juveniles' rights and elevate those rights above those accorded an adult. She contends that the legislature intended to protect children from coercion, and that the presence of a magistrate is a safeguard against the waiver of a juvenile's rights by those minors who lack the experience or judgment to waive them. We believe, however, that Vega's statutory rights were protected when, in the absence of a magistrate, Illinois authorities spoke with Vega and determined that she not only understood the nature and contents of her statement, but that she was also signing it knowingly, intelligently, and voluntarily. Vega was afforded the procedural safeguards of the family code.

The Texas provisions are not constitutionally mandated; they were added to provide a mechanism to make sure that a juvenile's right against self-incrimination was protected when an attorney was not present during questioning. The underlying purposes of the Texas requirements were accomplished and Vega's constitutional rights upheld. The process of taking Vega's statement in Illinois in the absence of a magistrate was exercised and enforced in a manner that achieved a fitting and right balance of considerations such that both parties were assured a fair hearing where the parties' legal rights were recognized and enforced. While the process was not precise and violations of the Texas Family Code occurred, based on the record before us, the process was fair to both Vega and the State. It was impartial, honest, and free from prejudice, undue favoritism, and self-interest. *See Casteel,*

875 P.2d at 24. It achieved a fitting and right balance of considerations. *Id.*

Our evaluation of the "fairness" issue compels a conclusion that Vega's statement was properly admitted under Texas law. Accordingly, we conclude the trial court correctly determined that those actions adequately protected Vega, notwithstanding the absence of the magistrate, making the statement admissible. Thus, the trial court did not err in denying her motion to suppress. We overrule issues five, six, seven, ten, and eleven.

### b. Section 52.025 Violations

In issues nine and thirteen, Vega contends that her statement should be suppressed because the Illinois authorities violated section 52.025 of the family code. Specifically, she contends that she was detained more than six hours before the conclusion of her statement,[20] and that she was improperly left unattended in the interview room.[21] *See* Acts 1991, 72nd Leg., ch. 495, § 2, eff. Sept. 1, 1991 (current version at Tex. Fam.Code Ann. § 52.025 (Vernon 2002)). The court of criminal appeals agreed that these circumstances violated provisions of Title 3, specifically those found in section 52.025. *See Vega*, 84 S.W.3d at 619.

However, unlike section 51.095(a) discussed above, section 52.025 is not an independent exclusionary statute. *Gonzales v. State*, 67 S.W.3d 910, 912 (Tex. Crim.App.2002). Therefore, as the court of criminal appeals explained in *Gonzales*, in order for a juvenile's written statement to be suppressed because of a section 52.025 violation, there must be some exclusionary mechanism. *Id.* That mechanism is section 51.17 of the family code which provides that "Chapter 38, Code of Criminal Procedure, applies in a judicial proceeding under this title." *Id.* Thus, at the direction of the *Gonzales* Court, "if evidence is to be excluded because of a section 52.025 violation, it must be excluded through the operation of article 38.23(a)." *Id.*

> Article 38.23(a) provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas ... shall be admitted in evidence." Our decisions have established that evidence is not "obtained ... in violation" of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence.

*Id.* The defendant has the burden to show a causal connection between that violation and her ensuing confession. *Gonzales v. State*, 125 S.W.3d 616, 619 (Tex.App.-Houston [1st Dist.] 2003) (en banc), *aff'd sub nom. Pham v. State*, 175 S.W.3d 767 (Tex.Crim.App.2005).

Here, Vega had the burden to prove that the violations of section 52.025 caused her to make her statement. Although Vega acknowledges the causal connection requirement, she has not claimed that these violations caused her to give her statement. Further, even had she raised this contention, Vega points to no evidence in the record demonstrating a causal connection between the violations and her decision to give a statement to the police, and we have found none. Accordingly, we overrule issues nine and thirteen.

### III. Illinois Law

By her fourteenth issue, Vega complains that, should this Court determine that Illinois law rather than Texas law should

---

**20.** Now Tex. Fam.Code Ann. § 52.025(d) (Vernon 2002).

**21.** Now Tex. Fam.Code Ann. § 52.025(c) (Vernon 2002).

govern the admissibility of the instant statement, the trial court erred in overruling Vega's motion to suppress evidence because the authorities did not comply with Illinois law in taking her statement. As set out above, the court of criminal appeals determined that Texas law, not Illinois law, applies. *Vega,* 84 S.W.3d at 617; *see also id.* at 621 (Keller, J., dissenting). Therefore, we find it unnecessary to address this issue. *See* Tex.R.App. P. 47.1.

## IV. Arrest Warrant and Supporting Affidavit

■ By her fifteenth issue, Vega contends that the trial court erred in overruling her motion to suppress evidence because the arrest warrant and supporting affidavit were not introduced into evidence and because the State failed to present facts otherwise justifying her detention, in violation of the Fourth Amendment to the United States Constitution. By issue sixteen, Vega brings the same contention alleging a violation of article I, section 9 of the Texas Constitution, and article 38.23 of the Texas Code of Criminal Procedure.

■ A trial judge is the sole trier of fact at a suppression hearing and thus evaluates witness testimony and credibility. *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex.Crim.App.2002) (citing *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim. App.1991)). When we review a trial court's ruling on a motion to suppress, we give great deference to the trial court's determination of historical facts while reviewing the court's application of the law de novo. *Maxwell,* 73 S.W.3d at 281 (citing *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000)). The appellate court must view the evidence in a light most favorable to the trial court's ruling when the trial court does not file any findings of fact. *Id.* When, as here, no such findings of fact

were made, the appellate court will assume that the trial court made implicit findings of fact that support its ruling, as long as the findings are supported by the record. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990) [ (en banc) ].

*Torres v. State,* 182 S.W.3d 899, 902 (Tex.Crim.App.2005).

Vega argues that the testimony adduced at the motion to suppress hearing failed to show any facts or circumstances under which Vega was wanted in Texas, and the warrant and supporting affidavit were never introduced; thus, the State failed to sustain its burden of proof. However, at the suppression hearing in this case, the "LEADS" message received by the Illinois police from Starr County, Texas, that noted Vega and Nonn had outstanding warrants in Texas for aggravated kidnaping and murder was read into the record. Detective Chernikovich testified that at approximately 11:30 a.m. on the day Vega was picked up, he was faxed copies of the warrants, the affidavits reporting the warrants for arrest, and an incident report regarding an abandoned vehicle that contained a deceased victim. Detective Chernikovich also testified that he had a conversation with a Texas officer, in which he "had mentioned that they had obtained some pawnshop receipts with Jaime Nunn's [sic] signature on it [sic]." Moreover, under section 52.01(a)(3) of the Texas Family Code, in effect at the time of the arrest, a child could be taken into custody by a law-enforcement officer if there were reasonable grounds to believe that the child had engaged in conduct that violated a penal law of this State or delinquent conduct or conduct indicating a need for supervision. *See* Acts 1993, 73rd Leg., ch. 115, § 2, eff. May 11, 1993 (current version at Tex. Fam.Code Ann. § 52.01(a)(3)(A), (B) (Vernon Supp.2006)).

Giving great deference to the trial court's determination of historical facts, reviewing the court's application of the law *de novo*, and viewing the evidence in a light most favorable to the trial court's ruling, *see Torres*, 182 S.W.3d at 902, we conclude that the trial court did not err in denying Vega's motion to suppress on this basis. We overrule issues fifteen and sixteen.

## V. Rule 404(b) and 403 Objections to Extraneous Offense Testimony

In issue seventeen, Vega contends that the trial court erred in admitting evidence of extraneous offenses in violation of Texas Rules of Evidence 404(b) and 403—that the extraneous offense evidence was irrelevant and that the probative value, if any, was substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403, 404(b). Vega contends that the admission of testimony regarding her use of drugs and alcohol, having sex with an older man, running away from home, and being a liar, was harmful—that it effectively diverted the jury's attention from the issues in this case. Vega asserts that these errors affected her substantial rights; depriving her of a fair trial at the guilt/innocence and punishment phases, a trial that resulted in an automatic life sentence for capital murder and twenty-year sentences for aggravated robbery and aggravated kidnaping. *See* Tex.R.App. P. 44.2(b).

### A. The Law

When reviewing a trial court's ruling on the admission of evidence, an appellate court applies an abuse of discretion standard of review. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g) [ (en banc) ]. A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Green v. State*, 934 S.W.2d 92, 101–102 (Tex.Crim.App. 1996).

*Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim.App.2007).

 Evidence that does not have relevance apart from character conformity is inadmissible. Tex.R. Evid. 404(b). Extraneous-offense evidence is not inadmissible under Rule 404(b) if the extraneous-offense evidence is relevant to a fact of consequence apart from its tendency to show conduct in conformity with character. *Johnston v. State*, 145 S.W.3d 215 (Tex.Crim.App.2004). Extraneous-offense evidence is not inadmissible under Rule 404(b) when it is offered to rebut an affirmative defense or a defensive issue that negates one of the elements of the crime. *Id.; Powell v. State*, 63 S.W.3d 435, 438–440 (Tex. Crim.App.2001).

*Id.* Once a trial court determines the uncharged misconduct evidence is not barred under rule 404(b), the opponent of the evidence may further object under rule 403—that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Id.* Once a rule 403 objection is made, the trial court balances:

(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and· (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted.

*Id.* (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex.Crim.App.2006) (noting the factors may blend together in practice)).

### B. Challenge to Testimony

On direct examination, Vega testified that she used drugs and alcohol, came from an erratic family background, lied about being pregnant, had been raped the night before her crime spree, and that her husband, an older man, was abusive. Through her testimony Vega suggested, as the defense claimed, that her state of mind was one of helplessness, that she was essentially under Nonn's control. Vega also testified that she loved Nonn, that he was always there for her, and that she forgave him. During cross-examination, the State again elicited testimony from Vega regarding drug and alcohol use, having sex with an older man, her alleged pregnancy, running away from home, and being a liar.

After Vega objected to the State's questions on the basis of rules 403 and 404(b), in a bench conference outside the presence of the jury, the State addressed the trial court as follows:

> [The defense] put on this witness [appellant], and they have gone on and testified about her history from here to eternity. We're seeking to correct misimpressions they've laid as to what this girl was doing at the time. The only thing she was doing was drugs. It's not our case-in-chief. It's their witness, they put her on. She's subject to cross-examination. We're cross-examining her.

The State continued, "They've raised this issue about some kind of mental state that she was in at the time this happened, and if she was using drugs at the time, that goes to her mental state." The trial court then stated, "I'm going to allow it in."

### C. Rule 404(b) Objection

■ As the State represented to the trial court, the testimony elicited by the State was to rebut Vega's claim that she did not make her own choices in life. She chose to marry an older man and, thus, had sex with an older man. Vega ran away from home. She put her maturity, sophistication, and independence at issue by claiming she was under Nonn's control. The evidence established that Vega could escape from situations she did not want to be in; that she was not helpless and not under the control of another; and that she could make her own choices at the time in question. *See Johnston*, 145 S.W.3d at 219. Further, the fact that Vega lied about being pregnant, which "necessitated" a marriage, went to Vega's ability to tell the truth; the use of drugs went to Vega's then-existing state of mind. The evidence was also offered to rebut a defensive issue that negates one of the elements of the crime—intent. *Id.; Powell*, 63 S.W.3d at 438–40; *see* Tex. Penal Code Ann. § 19.03 (Vernon Supp.2006), §§ 20.04, 29.03 (Vernon 2003) (setting out intent as an element of each offense).

We conclude that the trial court's decision that the evidence was relevant lies within the zone of reasonable disagreement. *See Montgomery*, 810 S.W.2d at 391; *see also* Tex.R. Evid. 404(b). The extraneous-offense evidence was relevant to a fact of consequence apart from its tendency to show conduct in conformity with character. Thus, we conclude the trial court's determination that the evidence was relevant was not an abuse of discretion. *See Montgomery*, 810 S.W.2d at 391.

### D. Rule 403 Objection

■ Vega cites to *Crank v. State*, 761 S.W.2d 328, 341 (Tex.Crim.App.1988), *overruled on other grounds, Alford v. State*, 866 S.W.2d 619, 624 n. 8 (Tex.Crim. App.1993) (en banc), for the well-settled proposition that evidence of extraneous offenses is "inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him." Without

more, Vega contends only that, through extraneous-offense testimony elicited by the State regarding her being a criminal generally, her substantial rights were affected. *See* Tex.R.App. P. 38.1(h) (providing that this Court will only consider contentions that are supported by clear and concise arguments with appropriate citations to authorities and to the record). Nonetheless, we cannot determine that Vega was prejudiced, that the issues were confused, and that she was forced to defend herself against charges against which she had not been notified, when Vega testified to the same matters on direct examination. We conclude the trial court did not abuse its discretion when it determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Accordingly, we overrule Vega's seventeenth issue.

### VI. Limiting Instruction for Extraneous Offense Testimony

■ By her eighteenth issue, Vega contends the trial court erred when it instructed the jury that it could "consider the extraneous offenses in determining the maturity, sophistication and independence of Appellant in connection with the offense." Vega argues that the instruction was inappropriate because those bases were not relevant to any material issue in the case. However, Vega testified to the same matters on direct examination. Vega put her maturity, sophistication, and independence at issue by claiming she was under Nonn's control. Thus, it became a material issue. The jury was instructed for what purposes it could consider the extraneous offenses. "Generally, we presume the jury follows the trial court's instructions and that a limiting instruction cures any harm." *Moore v. State*, 882 S.W.2d 844, 847 (Tex.Crim.App.1994) (en banc). Therefore, even if the trial court erred in allowing any of the testimony into

evidence, any error was harmless because the instruction, which we presume the jury followed, identified material issues for which the evidence could be considered under rule 404(b). Moreover, Vega offers no evidence rebutting the above presumption. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App.2005) (providing that the presumption may be rebutted, but only by evidence that the jury disregarded the judge's instructions). Rather, Vega only appears to suggest that her sentence was excessive because she received an automatic life sentence for capital murder, and twenty-year sentences for aggravated robbery and aggravated kidnaping. We overrule Vega's eighteenth issue.

### VII. Conclusion

Accordingly, we affirm the judgment of the trial court.