# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00027-CR

**Terrell Maxwell, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. D-1-DC-08-300490, HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Terrell Maxwell of the offense of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2009). Because Maxwell was 17 years old at the time he committed the offense, the State did not seek the death penalty. Instead, punishment was automatically assessed at life imprisonment without the possibility of parole. In four issues on appeal, Maxwell asserts that the evidence is legally and factually insufficient to sustain his conviction, that the district court abused its discretion in admitting evidence of an extraneous offense, and that his sentence constitutes cruel and unusual punishment. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on the night of December 15, 2007, Fernando Santander was shot in the head and killed while sitting in a parked van at his apartment complex in north Austin. Santander's body was discovered by friends early the next morning.

Detective Mark Gilchrest of the Austin Police Department was dispatched to the scene to secure and collect evidence. At Maxwell's trial, Gilchrest was asked to describe his findings and observations at the scene. Gilchrest testified that he had observed Santander's body in the front driver's seat, "slumped over to his right across the center console of the van. There was obvious severe traumatic injury to the head." According to Gilchrest, Santander appeared to have been shot while "in an upright position while sitting in the driver's seat." In Gilchrest's opinion, based on the bruising and damage to Santander's head, the gun had been held against his cheek when it was fired. The absence of tissue matter on the inside of the driver's side door indicated to Gilchrest that the shooter would have been "between the opening of the door [of the van] and the door itself" when firing the gun.

An autopsy confirmed that Santander had been shot in the face, with the gun held against the surface of his skin. According to the medical examiner, Dr. David Dolinak, the bullet entered Santander's head through the upper back part of his left cheek, went through his head "in a left to right manner, going through the front part of his brain," and exited the right side of his head. Dolinak also determined "that the path of the bullet through his head was in an upward direction," meaning that "the gun was angled upwards when it was held to the left side of his face."

2

Greg Karim, a firearms examiner with the Austin Police Department, testified that "a .44 caliber jacketed hollow point copper jacket fragment" was recovered from the parking lot where the van had been parked. According to Karim, the bullet fragment was consistent with Remington ammunition, specifically ".44 Magnum caliber semi-jacketed hollow point by design." This indicated to Karim that the type of weapon most likely used in the shooting was a revolver.[1]

Detective Kerry Scanlon of the Austin Police Department was the lead investigator in the case. During the investigation, Scanlon obtained information from a "tipster" at the Del Valle jail that led him to suspect that three individuals had been involved in the offense—Rashad Dukes, Michael Jamerson, and Terrell Maxwell. Dukes and Jamerson were interviewed by the police, but an attempt to interview Maxwell was unsuccessful.

Scanlon also learned that a blue Geo Prism belonging to Jamerson's mother may have been used by the suspects on the night of the offense. Scanlon testified that a search warrant was obtained for the vehicle and that a box of .44 Remington Magnum ammunition was found inside. This was significant to Scanlon "[b]ecause the projectile that killed the victim was determined to be a .44 caliber by our firearms examiner."

Both Jamerson and Dukes testified for the State and claimed that Maxwell was the shooter. Jamerson recounted that on the night of the shooting, Maxwell and Dukes had decided to rob someone and had persuaded Jamerson to join them. Jamerson agreed to drive them to wherever they wanted to go. According to Jamerson, during the drive, both he and Dukes were unarmed, but Maxwell was in possession of a "big revolver." Jamerson described the revolver

_____

[1] The firearm allegedly used in the offense was never recovered.

3

as being "all black" except for a "pearl white" handle. Jamerson agreed with the prosecutor's description of the weapon as "kind of a cowboy-looking gun."

Jamerson testified that Maxwell had directed him to an apartment complex located off of Rutland Drive. This location was chosen, Jamerson claimed, "because that is where the dope dealers and Mexicans were." Once they arrived at the complex, Jamerson parked the car. They then began planning the robbery. According to Jamerson, Maxwell told him that "if the dude didn't give him the money," Maxwell was "going to bust." Jamerson explained that "going to bust" meant that Maxwell was going to shoot the victim. However, Jamerson did not take seriously Maxwell's claim. Jamerson testified, "[W]e were all high so like it just skipped my mind." He added, "I didn't know there was bullets in the gun."

Eventually, Maxwell, Dukes, and Jamerson exited the vehicle and approached a man parked in a van. Jamerson, who testified that he was the last one to get out of the car, claimed that Maxwell and Dukes were already at the van attempting to rob the man by the time he arrived. Jamerson recounted that Dukes was standing at the passenger side of the van while Maxwell was on the driver's side, holding a gun to the man's head. Jamerson explained, "As soon as I walked up, the gun went off. Like I was standing on the side of him, told him, hurry up, let's go, hurry up, and the gun went off." Blood and brain matter then splattered on Jamerson, and he and the others "ran to the car." As they were running, Jamerson yelled and "cussed" at Maxwell. Jamerson testified that he was angry "[b]ecause I didn't know that was going to happen. That wasn't supposed to happen and I was pissed."

4

Dukes's account of the incident was similar to Jamerson's. Dukes testified that on the night of the robbery, he, Maxwell, and Jamerson had been at Jamerson's apartment "smoking weed and watching movies" when Maxwell came up with the idea to rob somebody. Dukes and Jamerson had agreed to go with him. They chose the apartment complex on Rutland Drive because, as Dukes put it, "a lot of Mexicans stay over there" and "half of the time when they get their paychecks it's in cash." During the drive to the complex, Dukes testified, Maxwell was in possession of a .44 caliber revolver that Dukes described as gray with a "pearl handle" and "kind of long," "like a cowboy's gun." When they arrived at the complex, they waited in the car for approximately five minutes. During that time, Dukes claimed, Maxwell informed the others that he was going to shoot the person they robbed if that person did not give them money.

When they were ready to commit the robbery, Dukes, Maxwell, and Jamerson exited the car and approached the van. Dukes testified that after they had arrived at the van, Maxwell held the gun to the head of the man inside and demanded that he "give him his money." Dukes recalled, "The dude was so scared, I guess, he put up his hands, he put up his hands out of shock." According to Dukes, "[T]hat's when Maxwell shot him." Immediately thereafter, Dukes, Jamerson, and Maxwell "all took off running at the same time," returned to Jamerson's car, and drove away.

When Maxwell, Dukes, and Jamerson returned to Jamerson's apartment, the three of them, according to Jamerson, began "cussing, yelling, [and] arguing" about the shooting. Maxwell told the others that "he didn't mean to do it" and that "it was an accident." Maxwell also asked if he could change into Jamerson's clothing, and Jamerson agreed. Jamerson then took a shower with his girlfriend, Tiffany Kyles. Jamerson testified that he told Kyles about what had

happened. Meanwhile, Dukes went into the bedroom where his girlfriend, Tawanna Eaglin, was sleeping, awakened her, and told her what had happened. When Dukes returned to the living room, Maxwell told him that he had called a cab. Shortly thereafter, the cab arrived and Maxwell left the apartment.

Other evidence considered by the jury included the testimony of Jamerson's girlfriend, Kyles; Dukes's girlfriend, Eaglin; and Anthony Lovingood and Rachel Sullivan, two people who were allegedly robbed by Maxwell and Dukes several days prior to the shooting. We review this other evidence in more detail below.

The jury found Maxwell guilty of the offense of capital murder as alleged in the indictment. The district court sentenced him to life imprisonment without the possibility of parole. This appeal followed.

## ANALYSIS

### Extraneous offense evidence

We first address Maxwell's third issue, in which he asserts that the district court abused its discretion in admitting evidence of an extraneous offense, specifically an aggravated robbery that Maxwell and Dukes allegedly committed six days prior to the murder. The State counters that the evidence was admissible to show intent, identity, and to rebut a defensive theory.

Over objection by defense counsel, the State presented evidence that on December 9, 2007, six days prior to the shooting, Anthony Lovingood and his girlfriend, Rachel Sullivan, were robbed at their apartment. Lovingood testified that when the incident occurred, Sullivan was in their bedroom sleeping while he was in the living room watching television. Lovingood heard a knock

6

on the door, answered it, and was greeted by Dukes, who at the time was Lovingood's friend. Dukes came in, sat down and talked with Lovingood for a short time, and then left. Dukes returned to the apartment shortly thereafter. Two or three minutes after he had returned, Dukes told Lovingood that "somebody is knocking at your door." Lovingood went to the door, opened it, and was confronted by an unknown man who Lovingood identified in court as Maxwell. According to Lovingood, Maxwell walked into the apartment toward the dining area, where Lovingood's two-year-old stepdaughter was sitting in her highchair. When Lovingood turned around, he noticed that Maxwell was holding a gun, specifically a revolver, which Lovingood described as "black with a white handle, long nose" that was "maybe like two and a half inches long." While Maxwell stood next to Lovingood's stepdaughter and pointed his gun at Lovingood, Dukes approached Lovingood, patted him down, and searched through his pockets, presumably for money. Lovingood told Dukes that "I wasn't going to give him my money" and that "he was going to have to shoot me." According to Lovingood, Maxwell responded, "[W]ell, I'm going to have to shoot you."

At that point, Lovingood testified, Sullivan came into the room "kind of crying and angry," and Maxwell "threw [the gun] up in her face." Dukes then proceeded to search through Sullivan's purse, wallet, and several drawers in the house, looking for money, while Maxwell pointed his gun "back and forth" between Lovingood and Sullivan. Lovingood recalled that the muzzle of the gun was "no more than three feet" away from his chest and that it was "maybe like a centimeter away" from Sullivan's face.

After Dukes found some cash in Sullivan's purse and grabbed Lovingood's cell phone, he and Maxwell left the apartment. Lovingood and Sullivan waited "maybe 20 seconds"

7

and then attempted to follow Maxwell and Dukes. They saw them get into a "light blue, maybe faded baby blue . . . older small car" and then drive away. Lovingood was able to see part of the license plate number, which he reported to the police as "PQ9RK." Although he was not certain of the last letter on the plate, he believed it may have been an R, a Q, or an M.[2] Lovingood was shown a photograph of the blue Geo Prism that had earlier been admitted into evidence and testified that it was "the exact car" that he had seen Maxwell and Dukes get into and drive away.

Sullivan similarly testified regarding the incident. Sullivan recounted how she heard loud noises coming from the living room, came out of her bedroom, and saw "[t]he guy known as Terrell, he was holding a gun to my boyfriend's head." Sullivan testified, "I was so upset, so I started yelling and asked him to leave the house." According to Sullivan, Maxwell responded by pointing the gun at her and telling her to "shut the f**k up." The gun was "like that close to my foreheard," Sullivan testified, indicating with her hands the proximity of the gun to her head. Sullivan described the gun as a revolver with a "long barrel." Sullivan was also shown a photograph of the blue Geo Prism, and testified that it was the car that she had seen Maxwell and Dukes get into and drive away. Finally, Sullivan identified Maxwell in court as the person who had held a gun to her face.

Maxwell objected to the above evidence on the grounds that it was not relevant, that it was more prejudicial than probative, and that it violated the rule 404(b) prohibition against character evidence. *See* Tex. R. Evid. 401, 403, 404(b). The State argued that the evidence was admissible

---

[2] The exact license plate number of the blue Geo Prism that was allegedly involved in the charged offense was "P29RKM."

to establish Maxwell's intent to commit the charged offense, his identity as the shooter, and to rebut the defensive theory of mistake. The district court agreed with the State and admitted the evidence.

When reviewing a trial court's decision to admit or exclude evidence, we apply an abuse-of-discretion standard. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The trial court does not abuse its discretion unless its ruling lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Tex. R. Evid. 404(b). It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id*. "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "'Rule 404(b) is a rule of inclusion rather than exclusion.'" *Id*. (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id*. (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). A trial court's ruling on extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *Id*. at 344 (citing *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)).

9

Rebuttal of a defensive theory is one of the permissible purposes for which extraneous offense evidence may be admitted. *See Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). Further, extraneous offenses are admissible to rebut defensive theories raised by the testimony of a State's witness during cross-examination. *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996).

On this record, we cannot conclude that the district court abused its discretion in admitting the above evidence. It would not have been outside the zone of reasonable disagreement for the district court to conclude that the evidence went directly to the issue of Maxwell's intent to commit the charged offense. The alleged robbery occurred less than one week prior to the shooting and had several similarities to the charged offense. Both Maxwell and Dukes were identified by Lovingood and Sullivan as the robbers; the gun that was used during the robbery was similar to the gun used in the shooting; Maxwell had threatened to "shoot" Lovingood if he did not cooperate, just as, according to Jamerson and Dukes, Maxwell had claimed he was going to shoot the murder victim; and the getaway vehicle used during the robbery was also similar to the getaway vehicle used in the shooting. Based on these similarities, the district court could have reasonably concluded that the evidence had a tendency to show that Maxwell had intended to commit the subsequent attempted robbery and the shooting that had resulted in the victim's death.

Nor would it have been outside the zone of reasonable disagreement for the district court to conclude that the identity of the shooter was a material, non-propensity issue in the case and that Maxwell's alleged actions during the earlier robbery were relevant to that issue. One of Maxwell's theories at trial was that either Dukes or Jamerson was the actual shooter. Evidence

10

showing that during a prior robbery it was Maxwell who had brandished a gun—particularly a gun that was similar to the one allegedly used in the charged offense—and had held it close to the face of one of the alleged victims—similar to how the gun had been held to the face of the murder victim—had a tendency to show that Maxwell was in fact the shooter during the charged offense. Additionally, another defensive theory was that if Maxwell had been the shooter, the shooting was an accident. The district court could have reasonably concluded that evidence tending to show that Maxwell had used the same or a similar gun in another robbery several days prior to the shooting had a tendency to rebut that theory and thus was also relevant on that basis.

We also cannot conclude that the district court abused its discretion in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id*. at 880. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). Evidence should be excluded under rule 403 only when there exists "a clear

11

disparity between the degree of prejudice of the offered evidence and its probative value." *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

Here, the district court could have reasonably concluded that the probative value of the evidence was high—as we discussed above, it had a tendency to show that Maxwell was the alleged shooter and that he had intended to commit the charged offense. And, given that the State's case relied in large part on accomplice testimony, the district court could have reasonably concluded that the State's need for the evidence was high. At the same time, the district court could have reasonably concluded that the extraneous offense evidence, involving an alleged robbery in which Maxwell had threatened the victims but committed no actual violence against them, was not so inflammatory that there was a "clear disparity" between the degree of prejudice of the offered evidence and its probative value. We also observe that the district court provided a limiting instruction in the jury charge prohibiting the jury from considering the evidence for an improper purpose.[3] There is no indication in the record that the jury disregarded that instruction. *See Vega v. State*, 255 S.W.3d 87, 105 (Tex. App.—Corpus Christi 2007, pet. ref'd) (holding that, even if trial court erred in admitting extraneous offense evidence, "any error was harmless because the

---

[3] The instruction provided,

The defendant is on trial solely on the charge contained in the indictment. In reference to evidence, if any, that the defendant has previously participated in recent transactions or acts, other than but similar to that which is charged in the indictment in this case, you are instructed that . . . you may only consider the same for the purpose of determining intent, identity or absence of mistake or accident, if it does, and for no other purpose.

12

[limiting] instruction, which we presume the jury followed, identified material issues for which the evidence could be considered under rule 404(b)").

We overrule Maxwell's third issue.

**Sufficiency of the evidence**

We next address Maxwell's first and second issues, in which he contends that the evidence is legally and factually insufficient to sustain his conviction.[4] Specifically, he argues that there was insufficient evidence corroborating the testimony of the alleged accomplice witnesses, Jamerson and Dukes.

A person commits the offense of capital murder if the person intentionally causes the death of an individual and the person intentionally commits the murder in the course of attempting to commit robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2009). In evaluating the sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. State*, 301 S.W.3d 675, 683-84 (Tex. Crim. App. 2009). This standard "gives full play to the jury's responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to draw

---

[4]   The court of criminal appeals has recently concluded that there is "no meaningful distinction" between the legal and factual sufficiency standards of review and that the "two standards have become indistinguishable." *See Brooks v. State*, No. PD-0210-09, 2010 Tex. Crim. App. LEXIS 1240, *25-26 (Tex. Crim. App. Oct. 6, 2010). The court has therefore decided that "the *Jackson v. Virginia* [legal sufficiency] standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id*. at *57. Accordingly, we confine our review to that standard.

reasonable inferences from the evidence." *Williams*, 301 S.W.3d at 684 (citing *Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The accomplice witness rule provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence "tending to connect" the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). "When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id*. (citing *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994)). "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Id*. (citing *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). "There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes; '[e]ach case must be judged on its own facts.'" *Id*. (quoting *Gill*, 873 S.W.2d at 48).

14

In this case, there is other evidence in the record, apart from the accomplice testimony of Jamerson and Dukes, tending to connect Maxwell to the offense. First, the evidence regarding the prior robbery of Lovingood and Sullivan tends to connect Maxwell to the shooting. The prior robbery occurred less than one week before the shooting; the same or a similar firearm was used during the commission of both offenses; Lovingood and Sullivan both identified Maxwell as the man who had held them at gunpoint; Maxwell had held the gun close to the face of Sullivan, just as the gun had been held close to the face of the murder victim; and the same getaway vehicle was used during the commission of both offenses. From this evidence a rational jury could reasonably infer that the crimes were sufficiently similar that Maxwell had been involved in both offenses.

Additionally, both Jamerson's girlfriend, Tiffany Kyles, and Dukes's girlfriend, Tawanna Eaglin, provided testimony tending to connect Maxwell to the offense. Kyles testified that Maxwell was at Jamerson's apartment the night of the offense and that Maxwell returned to the apartment with Jamerson and Dukes sometime after midnight. Kyles heard Jamerson ask Maxwell, "Why did you do that?" She also observed "spots" on Jamerson's shirt that looked like "brain and blood." When asked what Jamerson had told her regarding what had happened, Kyles testified, "That [they were] planning to rob somebody and that Terrell had the gun and [Jamerson] was checking [the victim's] pockets. Rashad was on the opposite side of the van. . . . [Jamerson] said the gun just went off while he was checking his pockets." When asked who was the shooter, according to what Jamerson had told her, Kyles answered, "Terrell Maxwell."[5] Moreover, Kyles

[5] There was evidence presented that Jamerson and Dukes had told their girlfriends what had happened while they were still under distress from the shooting. Thus, the district court admitted this testimony under the excited utterance exception to the hearsay rule. *See* Tex. R. Evid. 803(2). Maxwell does not challenge on appeal the admissibility of this evidence.

15

testified that prior to the night in question, she had seen Maxwell with a gun that was similar to the gun allegedly used in the offense. Kyles described the weapon as "a cowboy gun" that was "black and brown" in color, although she thought that "it was small" and did not know if it was a revolver. Kyles also testified that she had never seen Jamerson or Dukes in possession of that gun.

Eaglin similarly testified that she believed Maxwell was at the apartment with Jamerson and Dukes on the night of the shooting. Later that night, Eaglin recounted, Maxwell, Dukes, and Jamerson left the apartment together. At some point after midnight, Eaglin was awakened by Dukes, who, according to Eaglin, was not calm and collected and was "crying." When asked what Dukes had told her about why he was upset, Eaglin testified, "He told me that they tried to rob a Mexican and the gun went off and a Mexican got shot." Eaglin specified that "they" referred to "Rashad, Michael, and Terrell." Eaglin at first denied being told who the shooter was, but after reading a copy of the written statement she had given to the police, Eaglin testified, "I guess he said that Terrell shot the man. The gun went off. He didn't say Terrell shot the dude. He just said Terrell had the gun and the gun went off." From the testimony of Kyles and Eaglin, a rational jury could reasonably infer that Maxwell was with Dukes and Jamerson when the shooting occurred and that Maxwell was in fact the shooter.[6]

---

[6] Maxwell asserts that Kyles and Eaglin should also be considered accomplice witnesses because their testimony was based on what Jamerson and Dukes had told them regarding the offense. However, a witness is not an accomplice witness merely because she knew of the offense. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged. *Id*. There is nothing in the record suggesting that Kyles or Eaglin committed any affirmative act promoting the commission of the offense. Moreover, Kyles and Eaglin provided corroborating testimony other than what they had been told by Jamerson and Dukes, including that Maxwell was with Jamerson

16

Viewing the above evidence in the light most favorable to the verdict, we conclude that there is sufficient evidence tending to connect Maxwell to the offense. *See Simmons v. State*, 282 S.W.3d 504, 511 (Tex. Crim. App. 2009) (holding that non-accomplice evidence should be "viewed together, rather than as isolated, unrelated incidents" when assessing its sufficiency). Thus, the testimony of Jamerson and Dukes is sufficiently corroborated and we can consider it in our overall sufficiency analysis. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Figueroa v. State*, 250 S.W.3d 490, 501 (Tex. App.—Austin 2008, pet. ref'd). We have already summarized Jamerson's and Dukes's testimony implicating Maxwell as the shooter during the attempted robbery. We hold that the combined and cumulative force of their testimony and the other evidence considered by the jury, when viewed in the light most favorable to the verdict, would enable a rational trier of fact to find beyond a reasonable doubt that Maxwell committed capital murder as alleged in the indictment.

We overrule Maxwell's first and second issues.

**Punishment**

In his fourth issue, Maxwell asserts that his automatic sentence of life without the possibility of parole constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. In Maxwell's view, "In light of the youthful age of the Appellant at the time of the commission of the offense, it is cruel and unusual to not afford the youth some

---

and Dukes on the night of the murder, that the three men had left the apartment together, and that on prior occasions Kyles had seen Maxwell in possession of a firearm that was similar to the alleged murder weapon and that she had never seen Jamerson or Dukes in possession of that firearm.

possibility of one day being free" from prison. The State responds that Maxwell failed to preserve this claim for appellate review. We agree with the State.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion. *See* Tex. R. App. P. 33.1(a). However, Maxwell never raised a complaint to the district court, either during sentencing or in his motion for new trial, that his sentence constitutes cruel and unusual punishment. Texas courts, including this one, have consistently held that a claim of cruel and unusual punishment is waived unless an appellant first raises his objection to the trial court. *See, e.g.*, *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Schneider v. State*, 645 S.W.2d 463, 466 (Tex. Crim. App. 1983); *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd); *Noland v. State*, 264 S.W.3d 144, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Wise v. State*, 223 S.W.3d 548, 554 (Tex. App.—Amarillo 2007, pet. ref'd); *Williams v. State*, 191 S.W.3d 242, 262 (Tex. App.—Austin 2006, no pet.); *Steadman v. State*, 160 S.W.3d 582, 586 (Tex. App.—Waco 2005, pet. ref'd); *Buster v. State*, 144 S.W.3d 71, 81 (Tex. App.—Tyler 2004, no pet.); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.); *Nicholas v. State*, 56 S.W.3d 760, 768 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Hernandez v. State*, 10 S.W.3d 812, 816 (Tex. App.—Beaumont 2000, pet. ref'd); *Solis v. State*, 945 S.W.2d 300, 301 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). Because Maxwell failed to do so, no error has been preserved for review.

We overrule Maxwell's fourth issue.

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   November 12, 2010

Do Not Publish