

## NUMBER 13-12-00251-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI − EDINBURG

**JOSE JUAN VARELA,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

### On appeal from the 430th District Court of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Benavides

A jury convicted appellant, Jose Juan Cruz Varela, of murder, a first-degree felony, and he received a sentence of forty-five years' confinement. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011). By three issues, appellant contends that: (1) the evidence "is inadequate under the *Brooks* standard to show that the testimony of the co-conspirators was corroborated so as to show that [he] was a party or a conspirator to

the murder of his brother"; (2) the trial court erred in failing to suppress evidence acquired from a cell phone in appellant's possession when he was arrested "because there was no probable cause or other authority"; and (3) the trial court commented on the weight of the evidence in front of the jury by stating that one of the State's witnesses was a co-conspirator and a party opponent. We affirm.

## I. PERTINENT FACTS

Appellant had a brother named Ruben (the "victim"). The victim had a meeting with appellant and their father. During this meeting, Josue Gonzalez Rodriguez (the "shooter") shot and killed the victim.

Marco Antonio Hernandez stated that he knew appellant as "MP." According to Hernandez, shortly after he met appellant, appellant offered him $10,000 to kill someone.[1] Hernandez testified that he told appellant that he did not do that type of job, but that he would find someone who would do it. Hernandez spent several months attempting to find someone who would do the killing. Hernandez saved appellant's phone information on his own phone as "MP." Hernandez's phone number at this time was "776-5422." The men exchanged many phone calls.

Hernandez contacted Jose De Leon to do the killing. De Leon put Hernandez in contact with his "in-law," the shooter (Rodriguez). Hernandez and De Leon met in Reynosa, Tampico, Mexico in 2007, and the men discussed the killing.

In 2008, Hernandez informed appellant that he had found someone who would perform the killing. While at a meeting with De Leon, the shooter, and Hernandez, appellant gave some money to Hernandez, and the men went to "check the house

---

[1] Hernandez claimed that at the time that he did not know the identity of the intended victim.

2

where the person to be killed was supposed to be." Hernandez stated that initially, the men had planned for the shooter to kidnap the victim and force him to sign some paperwork, including a document that removed the victim and his mother as signatories on a bank account in Mexico. Hernandez testified that once the victim signed the papers, he would be killed. However, according to Hernandez, the plan changed because they were unable to locate the victim for the kidnapping.

According to Hernandez, the plan changed and the shooter was supposed go to the house, ask for "Ruben Ovidio" (the victim), and then kill him. According to Hernandez, at this time, appellant gave him a picture of the victim. Hernandez testified that he used the money that appellant gave him to get a car (a Grand Marquis) and a gun.

Hernandez stated that on the date of the killing, appellant informed him that a meeting would occur between the victim, appellant, and their father. Hernandez instructed the shooter to go to the location and "do whatever he had to do." De Leon was supposed to go to the location with the shooter but he declined to go and another man named "Fernando" went instead. However, Fernando did not know that the shooter planned to kill the victim. After the shooter killed the victim, Hernandez met with the shooter and Fernando at a Wal-Mart in Sharyland. Hernandez sold the gun used in the killing in Mexico. Hernandez asked a man known as "Pechocho" to burn the car used in the killing.

De Leon testified that Hernandez offered him $3,000 to kill somebody and that Hernandez would get $10,000 for the killing. De Leon stated that Hernandez had taken him to a subdivision named Cimarron and told him that the intended victim lived close to

3

their location. De Leon declined the offer to commit the murder for money. De Leon stated that, later, the shooter and Hernandez told him that the shooter had committed the murder. De Leon claimed that he did not know the victim, that he knew nothing about the Varela family, and that he did not know appellant other than seeing him in the newspaper.

Officer David M. Garcia testified that he investigated the scene shortly after the murder occurred. He interviewed appellant and testified that he found appellant "very evasive." Officer Garcia stated "[appellant] was being really animated in reference to what happened. I tried to get answers from him, and he would, pretty much, fall down and cry—overly animated." On cross-examination, Officer Garcia described appellant's behavior as "a fake cry" because usually when a person cries, "you see tears" and appellant had no tears. When asked if based on his training and experience he believed that appellant's behavior was suspicious, Officer Garcia replied, "Yes, I did."

Corporal Manual Casas testified that he investigated the murder. Bullet casings and shells were found at the scene of the murder; however, the murder weapon was never found. According to Corporal Casas, shortly after the murder, appellant was arrested "because they thought they had sufficient probable cause to detain him. [Appellant] was under arrest under an article of the Code of Criminal Procedure that allows the police to detain someone."

Corporal Casas later inspected the property taken from appellant when he was arrested, which included a black Motorola Boost phone (the "Motorola phone") that had been found in appellant's boot. Corporal Casas stated that based on the information he discovered in the Motorola phone, he located other phone records showing calls made

4

between appellant and other co-conspirators. Corporal Casas testified that appellant also had an iPhone, admitted as State's Exhibit No. 70. Corporal Casas testified that when he asked appellant about the Motorola phone, appellant told him that the phone belonged to a friend named "Tocayo." According to Corporal Casas, appellant claimed that he had the Motorola phone because he used it when the battery on his iPhone died.

Corporal Casas also inspected three small pieces of paper which were notes found in appellant's possession. State's Exhibit 73 includes the notes and State's Exhibits 74 and 75 are "Detalles Llamada" taken from the Motorola phone. Corporal Casas discovered that the Motorola phone had been purchased from a store owned by one of appellant's relatives. Corporal Casas found that one of the calls made on the Motorola phone was made ten minutes before the murder to someone identified on the phone as "Toca." Another number called belonged to Hernandez.

Corporal Casas determined that Hernandez had been involved in the murder and that a call was made from the Motorola phone to Hernandez on the date of the murder at 6:06 p.m. Corporal Casas testified that someone had called the number belonging to the shooter from the Motorola phone. Corporal Casas stated that there were also phone records showing that calls were made to and from Hernandez on appellant's iPhone.

According to Corporal Casas, Hernandez confessed that he had been involved in the murder, and the shooter admitted that he shot the victim. Corporal Casas also testified that the shooter told him that Hernandez acted as a middle man and that appellant "had actually asked for [the victim] to be murdered." Corporal Casas stated

that the shooter informed him that appellant had provided a black and white Xerox copy of a picture of the victim to assist him in identifying the victim. Corporal Casas testified that when shown a photo lineup with six pictures, the shooter identified appellant as "MP"—the man who wanted the shooter to kill the victim.

Jose P. Varela ("Pepe"), appellant's first cousin, testified that he spoke with Corporal Casas regarding the Motorola phone found in appellant's possession. Pepe owned a cellular phone store in downtown McAllen, Texas, and he also owned "another store of Nextel Radios" in Reynosa, Mexico. Pepe testified that he told Corporal Casas "that some phones were sold [to appellant] for business." Pepe did not have any knowledge of what the phone numbers assigned to those phones were.

Several witnesses testified that the victim did not have a good relationship with appellant and that the victim was afraid of appellant. Specifically, Jose Porfirio Cantu Alaniz, a friend of the Varela family, testified that: (1) the victim and appellant did not get along for the past few years; (2) the victim told him that appellant would pressure the family to give him money in large quantities; (3) the family wanted to take away appellant's check-writing privileges regarding the family business; (4) the victim attempted to mend his relationship with appellant; (5) the victim was a successful businessman; (6) the victim indicated that he was afraid of appellant; and (7) the victim was not fearful of anyone else and had no enemies.

Also, Francisco S. Avalos testified that before the murder, the victim was "worried, concerned, and very nervous" due to "things that happened" between appellant and their father and that the victim "always had the feeling that [appellant] was going to do something to him," including possibly that appellant would have something

6

to do with the victim's death. According to Avalos, the victim believed that appellant's conduct "was inappropriate" because "of the way some of the company money was being handled—and his parents had made a decision for him not to have any access . . . to the company's money." Avalos stated that the victim had been fearful of appellant for approximately two years before he died. Avalos said that the victim "was always preoccupied, and afraid. At times he wouldn't sleep—and on whatever occasion he had—for his own suspicion, preoccupation, and his safety, he would become real nervous." Avalos stated that eventually appellant's parents stopped allowing appellant to have access to their money; and, appellant believed that his parents were favoring the victim. Avalos stated that the victim asked him to pray for his family because appellant "had said that he was going to hurt the parents where it was the most hurtful— where it would hurt them in the worst place." Avalos testified that the victim never stated that he feared anyone other than appellant.

The victim's wife testified that the victim was afraid of appellant and that the victim "would tell [her], and also to [their children], that, not to open—if anyone comes to the house—and he would give us instructions for our own security that if he would go, not to open. . . ." The victim's wife stated that the victim was not afraid of anyone other than appellant. The victim's wife testified that the day before the victim was murdered, a man wearing a sweater came to the door asking for "Ruben Ovidio." The victim's wife explained that the victim did not open the door because it was not cold that day and "no one here knows him as Ruben Ovidio." The man told the victim that he wanted to discuss some properties; however, the victim refused to open the door. According to

7

the victim's wife, the victim "had something in his mind that [this occurrence] was related [to appellant]."

Apolinar Luna, who worked for the victim's father, testified that on the day of the murder, he waited outside the home where the men planned to meet in order to "warn" the victim of appellant's arrival because the victim was afraid of appellant. Luna stated that the purpose of the meeting was for the brothers "to discuss" their differences and "reach good terms, because the businesses were stopped." Luna did not participate in the meeting. Luna stated that the victim had expressed fear that someone was trying to kill him and that the victim was afraid of appellant.

Appellant's and the victim's mother, Maria del Carmen Cruz de Varela, testified that appellant's relationship with the victim was bad and that appellant threatened that blood would be spilled in the family. Appellant's mother stated that appellant was angry because the family stopped allowing him access to the family business. Appellant's mother stated that appellant "came to our home threatening us. He threatened out that he would do something bad. And we did this to protect him. He said you're family, but you're not my family." Appellant's mother said that the victim had expressed concern about appellant "trying to take his life." Appellant's mother testified that she told investigators that she believed that appellant was responsible for the victim's murder.

The prosecutor asked appellant's mother to review the documents found in Hernandez's possession and to explain what those documents were "purporting to do." Appellant's mother replied, "It is—so that the properties of [the victim]—[the victim's] properties—out in the hands of [appellant's] property, under his control and the name. Why? Why?" The record shows that appellant's mother then became emotional.

8

Appellant's mother explained that other documents found purported to "cancel" the victim's and her own signature from the bank account "and then freedom is given to [appellant's] signature to use it indifferently [sic]." Appellant's mother explained that some of the documents were giving "a power of attorney for [appellant] on the [victim's behalf]." While reviewing the documents, appellant's mother clarified that in one particular document, "[the victim] and [appellant's mother] are giving power of attorney to [appellant] of our properties. This one too."

Corporal Ted Rodriguez testified that when he interviewed appellant, appellant did not act like someone who witnessed his brother's murder. Rodriguez interviewed the victim's wife, and he learned that there was "some sibling rivalry" between appellant and the victim regarding money and properties. Corporal Rodriguez testified that the victim's mother indicated that the victim had one enemy—appellant. Corporal Rodriguez explained that the victim's mother told him that appellant became "enraged" when they "switched" the bank accounts to require "dual signatures" and that appellant "made the threat that there was going to be bloodshed because of those actions. He also indicated that the father would have been there to witness the bloodshed." Corporal Rodriguez stated that he asked the victim's mother to clarify her statement, and "she advised that she knew that she was referring to [the victim], that [appellant] was targeting [the victim]."

Corporal Rodriguez testified appellant was "detained" because the officers "had a reasonable suspicion" that appellant was a suspect in the murder and they wanted to "avoid [sic] him from fleeing." Corporal Rodriguez testified that Hernandez identified appellant as "MP" and told him that appellant had hired Hernandez to assist in the

9

murder. Corporal Rodriguez stated that the shooter confessed his part in the murder and the shooter identified appellant in a photo lineup as the person who hired him to kill the victim. Corporal Rodriguez testified that Hernandez kept some documents that the victim was supposed to sign "granting him the power over them" and once the victim signed the documents, the victim would be killed. Corporal Rodriguez explained that Hernandez said, "I have evidence that can prove the reason why he wanted him murdered" and that Hernandez then produced the documents. On redirect examination, Corporal Rodriguez stated that Hernandez told him, "I got evidence that can prove that [appellant] knows me, and I know him because I got documents made under his name in my possession." Corporal Rodriguez testified that the documents corroborated what Hernandez had told him about the murder, that the shooter's statement corroborated Hernandez's statement, and that the family indicated a motive for the murder. Corporal Rodriguez stated that Hernandez claimed that he called appellant on the day of the murder "to get him out of there so that he wouldn't get mistaken [for the victim]."

Appellant testified that he did not have any involvement in the victim's death. He stated that he told Corporal Casas that the Motorola phone did not belong to him and that a friend had left it with him. Appellant denied that it was possible for the Motorola phone to have been hidden in his boot. Appellant stated that he had a fine relationship with the victim but that they had business differences. Appellant claimed that because the victim had been openly developing the family's land in Reynosa, a group of men with machine guns had made the victim kneel and demanded money.

## II. CORROBORATION OF THE ACCOMPLICE WITNESSES' TESTIMONY

By his first issue, appellant challenges the sufficiency of the evidence corroborating the co-conspirators' testimony.

### A. Applicable Law

A person cannot be convicted based upon the testimony of an accomplice witness unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. TEX CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Corroborating evidence can be direct or circumstantial and does not have to establish the guilt of the accused. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) ("The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense."); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1984) (en banc). The corroborating evidence must merely tend to connect the accused to the commission of the offense. *Smith*, 332 S.W.3d at 442. In reviewing a complaint of insufficient corroborating evidence, we are required "to consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id.*

There are two types of accomplices: (1) accomplices as a matter of law; and (2) accomplices as a matter of fact. *Id.* at 439. A person is an accomplice as a matter of law if the witness is indicted for the same offense or a lesser-included offense as the accused. *Id.* However, when a doubt exists regarding whether the witness is an

11

accomplice, the trial judge may instruct the jury to determine the witness's status as a fact issue. *Id.* at 439–40.

## B.     Discussion

Appellant claims that Hernandez, the shooter, and De Leon were accomplices as a matter of law.[2] Appellant points out that Hernandez and the shooter were indicted for the victim's murder and that a jury found the shooter guilty of killing the victim and that conviction was affirmed by this Court. Thus, according to appellant, corroboration of their testimony was required. By a sub-issue, appellant contends that any references by the witnesses to any acts or statements made by the shooter must also be corroborated and that we may not rely on such evidence in corroborating the testimony of Hernandez and De Leon.

### 1.     The Shooter's Out-of-Court Statements

The shooter did not testify at trial. However, the trial court allowed the witnesses to testify about statements made by the shooter and actions the shooter took. In *Bingham v. State*, the court of criminal appeals "inferred" that article 38.14 requires corroboration only of testimony of "the legally understood kind"; that is evidence

---

[2] In a footnote to his brief, appellant states that the trial court "changed his mind" and decided that whether De Leon was a co-conspirator was a fact issue for the jury. Appellant states that the trial court instructed the jury that Hernandez was an accomplice as a matter of law. The State responds that appellant's statement that De Leon was an accomplice as a matter of law is a misstatement of the record. The State also points out that appellant has not claimed that the trial court erred by allowing the jury to determine whether De Leon was an accomplice as a matter of fact. According to the State, at the charge conference, appellant conceded that whether the accomplice-witness rule would apply to De Leon was a fact matter for the jury to decide. The State points out that at the conference, appellant's trial counsel said, "No, no. But that's not what I am arguing. I am not arguing that he should be an accomplice witness as a matter of law. I'm saying as a matter of fact. . . . And that's the issue that the jury needs to resolve, Judge. That's the question that's left up to the jury. They resolve whether or not he is, he isn't . . . ." Thus, the State appears to take the position that appellant cannot now claim that De Leon was an accomplice as a matter of law. However, for purposes of our analysis, we need not resolve whether De Leon was an accomplice as a matter of law or fact because we will assume, without deciding, that De Leon was an accomplice. *See* TEX. R. APP. P. 47.1.

12

adduced "through live witnesses speaking under oath or affirmation in presence of tribunal [.]" 913 S.W.2d 208, 210–13 (Tex. Crim. App. 1995). The court explained that the legislature did not regard out-of-court statements made by accomplices "with the same degree of suspicion as it did an accomplice witness who testifies in court." *Id.* at 211. The court held that the court of appeals "was mistaken to conclude that the trial court should have given an instruction to the jury that [an accomplice's] out-of-court statement must be corroborated before the jury could rely on it for conviction," and that "the court of appeals erred to hold that the trial court should have instructed the jury that accomplice witnesses cannot corroborate one another . . . [b]ecause [the non-testifying accomplice] did not give 'testimony' within the meaning of Article 38.14." *Id.* at 213.

Here, the shooter did not appear at appellant's trial and none of the statements attributed to him by other witnesses were under oath or in the presence of a tribunal; accordingly, the shooter did not give testimony within the meaning of article 38.14. *See id.* We therefore conclude that any references made by non-accomplice witnesses concerning the shooter's words and actions do not require corroboration. *See id.* Accordingly, we overrule appellant's sub-issue.

### 2. Corroboration of Hernandez's and De Leon's Testimony

The State concedes that Hernandez's testimony required corroboration before the jury could consider it and assumes that the jury determined that De Leon was an accomplice as a matter of fact also requiring corroboration. *See Smith,* 332 S.W.3d at 442. We, likewise, will assume, without deciding, that De Leon was also an accomplice witness and that his testimony required corroboration tending to link appellant to the murder. *See id.*

13

The State asserts that the following non-accomplice witness evidence tends to link appellant to the victim's murder: (1) appellant did not immediately call for help or offer help to the victim after witnessing his own brother's murder; (2) immediately after the murder, appellant told his father and Luna, "Let's go. Let's go. All of us, let's go from there, because this is going to become very hot"; (3) appellant had threatened that there would be "bloodshed" within his family due to his rivalry with the victim and the family's decision to cut him off from the bank accounts; (4) the motive for the killing (getting the victim to sign documents) was corroborated by the documents in Hernandez's possession which, if executed, would have had the effect of transferring to appellant rights to and control over most if not all of the victim's assets[3]; (5) Corporal Casas testified that the Motorola phone found in appellant's possession when he was detained "led" Corporal Casas "to the discovery of a lot of other things in this case"; (6) telephone records showed that there had been numerous phone calls between Hernandez and appellant on the Motorola phone and on appellant's iPhone, including calls made to and from appellant to Hernandez on the date of the murder and specifically a phone call at around the time the murder occurred; (7) Corporal Casas testified that the police determined that Hernandez was involved in the victim's murder; and (8) Corporal Casas testified that the phone records showed that there had been phone calls between the shooter and appellant on the Motorola phone.

---

[3] State's Exhibit 87 was admitted without objection and includes documents that the victim was allegedly supposed to sign as well as translations of these documents. The documents included two letters dated November 22, 2007 for the victim to sign, which state that the victim had requested to be removed from three bank accounts in Reynosa, Mexico. This would have left appellant as the sole signatory on the accounts. There were also several copies of documents for the victim to sign granting appellant "a general power of attorney for litigation and collections, acts of management and ownership." Appellant's mother testified that the power of attorney was for real property.

14

Further, the appellant's wife, Martha E. Varela, when asked by the prosecutor whether appellant had stated that "his family was going to pay," responded, "He told me that every one, we were going to pay him dearly." Martha also testified that she recalled that in 2007, she saw appellant making copies of certain documents including his mother's and the victim's passport pictures that he had "enlarged to letter size." Martha stated that after making the copies, appellant called someone and said that he had "finished the job of developing and printing, and that he was about to go there." Evidence was presented that the shooter had been provided with Xerox copies of the victim's picture. Finally, Avalos testified that appellant threatened to hurt his parents "in the worst place."

We conclude that the combined force of the above-mentioned evidence tends to connect appellant to the commission of the murder in this case. *See* TEX CODE CRIM. PROC. ANN. art. 38.14. As previously stated, the corroborating evidence need not establish appellant's guilt. We overrule appellant's first issue.

### III.   SUPPRESSION OF THE EVIDENCE

By his second issue, appellant contends that the trial court erred in "failing to suppress any information acquired as a result" of the seizure of the Motorola phone because appellant was arrested "without any probable cause or other authority." Without citing any authority, appellant argues that "[b]ut for the illegal arrest and detention in the Mission Police Department jail, the State would not have had the [Motorola] phone." Then, again without citation to authority, appellant states, "Whether Appellant's arrest was legal is not the issue as far as the statements are concerned. He

was under arrest and in custody and was asked question about the case," and the State failed to show that the officer read him his *Miranda* warnings.

## A. Pertinent Facts

A pre-trial hearing was held on appellant's challenge to the admissibility of comments he made to Corporal Casas that the Motorola phone was not his and that he only used it when his iPhone died. Appellant argued that the statements were inadmissible on the basis that he "had already invoked his right not to be questioned" when Corporal Casas asked about the Motorola phone. Corporal Casas testified that he did not receive any notice or letter from appellant's trial counsel that he was not allowed to question appellant. Corporal Casas stated that appellant did not invoke his right to an attorney when he was asked about the Motorola phone. Corporal Casas claimed that he did not question appellant about the case, and only asked him about the Motorola phone.

On cross-examination, Corporal Casas clarified that appellant was under arrest when he asked appellant about the Motorola phone. Corporal Casas stated that at that point, the Motorola phone had not been identified as evidence in the case against appellant. Corporal Casas admitted that he had not given appellant *Miranda* warnings before asking about the Motorola phone. On redirect examination, Corporal Casas stated that under the circumstances, no *Miranda* warnings were necessary because he was not questioning appellant about the murder itself.

## B. Failure to Suppress Any Information Acquired from the Motorola Phone

Appellant objected to the admissibility of the statements he made to Corporal Casas. The trial court stated that it would take the issue concerning appellant's

16

statement, while under arrest without being read the *Miranda* warnings, under advisement. The trial court told the prosecutor only to mention that a phone had been found in appellant's possession when he was arrested pending his review of authorities on the issue. Appellant argued that the State should not be allowed to mention that the Motorola phone had been found in appellant's possession. Appellant did not state the basis of his objection. The trial court again ruled that the State could comment that the Motorola phone was found in appellant's boot when appellant was arrested.

The trial court then explained that it had not yet ruled on appellant's objection to the admissibility of the comments he made to Corporal Casas regarding the Motorola phone. At the pre-trial hearing, appellant did not complain that the evidence obtained from the Motorola phone was inadmissible and did not object to the admissibility of the phone records or other evidence obtained as a result of the acquisition of the Motorola phone.

On appeal, appellant complains that the trial court abused its discretion by "failing to suppress any information acquired as a result" of the seizure of the Motorola phone because appellant was arrested without any probable cause or other authority. However, appellant cites no portion of this voluminous record where he objected on this basis, and we have found no such objection upon our review.[4] Appellant has also not cited any authority to support his contention that the trial court should have "suppress[ed] any information acquired as a result" of the seizure of the Motorola phone because appellant was arrested without any probable cause or other authority. Because appellant did not object at trial on the basis he complains on appeal, this issue

---

[4] There are over 1,500 pages of trial transcript in the record.

has not been preserved for our review. *See* Tex. R. App. 33.1; *see also id.* R. 38.1(i) (providing that appellant's brief must cite the record and appropriate authority).

Even if the issue had been preserved, it would be meritless. When the Motorola phone was offered into evidence as State's Exhibit 71 along with other items, trial counsel affirmatively stated, "I don't have any objections to any of the three [items], Judge" and when the records for the Motorola phone were offered into evidence as State's Exhibits 78 and 79, appellant's trial counsel stated that he had no objection to either exhibit. *See Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005) ("The affirmative acceptance of [] previously challenged evidence waive[s] any error in its admission."). Also, when Corporal Casas testified that the Motorola phone "led" him "to the discovery of a lot of other things in this case," appellant did not object. *See id.* We overrule appellant's second issue in this regard.

## C.     Failure to Suppress Appellant's Oral Statements to Corporal Casas

Appellant claims that Corporal Casas failed to perform any of the required procedures as set out in section 3(a) of article 38.22, which allows admission of a defendant's oral statements. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (West 2005).[5] Thus, according to appellant, all of his statements to Corporal Casas were inadmissible.

---

[5] Article 38.22, section 3(a) states:

(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

    (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

    (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

18

Appellant does not cite the record location where he objected on article 38.22 grounds or where the trial court ruled on such an objection, and we have not found any such objection or ruling in the record. Therefore, appellant has not preserved this issue for our review. *See* TEX. R. APP. P. 33.1. We overrule appellant's second issue in this regard.

Regarding his complaint that the officers failed to read him his *Miranda* rights, the State counters that although appellant made the objection outside the jury's presence, he never obtained an adverse ruling from the trial court. Therefore, error, if any, has not been preserved. We agree with the State.

At the conclusion of the pre-trial hearing, the trial court took the issue under advisement concerning the admissibility of appellant's statements to Corporal Casas that the Motorola phone belonged to a friend. The trial court made it clear to the parties that it wanted to review pertinent authorities before making a ruling. Appellant does not provide citation to where the trial court ruled on his objection, and we have not located such a ruling in the record. *See id.*; *see also id.* 38.1(i). Moreover, when Corporal Casas testified that appellant told him that the Motorola phone belonged to his friend "Tocayo," appellant did not object. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex.

---

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (West 2005).

19

Crim. App. 1991) ("[D]efense counsel must object every time allegedly inadmissible evidence is offered."). We overrule appellant's second issue in this regard.

### IV. IMPROPER COMMENT

By his final issue, appellant contends that the trial court "erred by making a statement in front of the jury that a witness being questioned by the prosecutor was a co-conspirator and a party opponent." Appellant argues that due to this error, he suffered egregious harm because: "(1) the comments tainted his presumption of innocence; (2) the [principal] factual issue for the jury to resolve was whether Appellant was a co-conspirator; and (3) the comments were on the weight of the evidence."

During his testimony, the prosecutor asked De Leon if Hernandez "at some point around February, 2008" offered him a job. Appellant's trial counsel objected on the basis of hearsay. A discussion was held off the record at the bench. The trial court then stated, "Okay. The objection is overruled. The Court is going to admit it as a statement of a co-conspirator. It's an exception to the hearsay rule. Go ahead." Appellant's defense counsel did not object to the trial court's comment regarding its reason for its ruling.

On a second occasion during De Leon's testimony, the prosecutor asked a question, and appellant's defense counsel objected on the basis of hearsay. The prosecutor argued that the statement was admissible because it was made by a co-conspirator. Appellant's defense counsel argued that the party had not been established to be a co-conspirator. The trial court then stated, "the Court is going to overrule the objection, and admit in under 801(e)(2), an admission of a party

20

opponent—the statement by a co-conspirator in furtherance of a conspiracy." Appellant's defense counsel did not object to the comment.

On a third occasion, during the State's direct examination of Corporal Casas, the prosecutor asked if Hernandez had provided "any information that led [him] to [appellant]." Corporal Casas replied that Hernandez had provided information. The prosecutor asked, "[W]hat specifically did you learn about the murder?" Appellant's trial counsel objected on the basis of hearsay. The trial court replied, "That's a statement of a co-conspirator," and it overruled the objection. Appellant's trial counsel did not object to the trial court's comment.

The State responds that appellant's complaint lacks merit because when the trial court made the complained-of statements, it was within the context of ruling on appellant's objections to certain testimony. The State further argues that an objection is ordinarily required to preserve error when a trial judge makes an allegedly improper remark or comment unless the error is so prejudicial that it fundamentally affects the presumption of innocence and cannot be cured by an instruction. Finally, the State points out that the jury was aware of the fact that De Leon and Hernandez were co-conspirators.

Appellant did not object to the trial court's comments. *Mestiza v. State*, 923 S.W.2d 720, 724, 726 (Tex. App.—Corpus Christi 1996, no pet.) ("A timely proper objection is necessary to preserve error concerning a trial judge's comment on the weight of the evidence."). Thus, the issue has not been preserved for our review. *See id.*; *see also* TEX. R. APP. P. 33.1. However, appellant argues that pursuant to the plurality opinion in *Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000) (plurality

21

op.), no objection was needed because the trial court's allegedly improper comments were so prejudicial that it fundamentally affected the presumption of innocence.

Nonetheless, we conclude that the trial court's comments in this case did not constitute fundamental error. The jury in this case heard ample testimony that Hernandez and De Leon had conspired to murder the victim. In *Blue*, the judge told the jury that, prior to his trial, the defendant had considered pleading guilty to the offense—facts that a jury would not have otherwise known—and that the judge would have preferred the defendant to plead guilty. *Id.* In effect, the trial court's comments in *Blue* provided the jury information that was not admissible, would not have been available to the jury, and insinuated that the defendant was in fact guilty and should not go to trial.[6] *Id.* Here, as stated above, the trial court's comments did not give the jury information that it did not already know. It made the comment in the context of ruling on objections. *See id.* Moreover, as the State points out, the trial court properly instructed the jury that it should not concern itself with any of the objections or rulings that it made, that the jury should presume appellant's innocence, and that it should wholly disregard the rulings and comments of the judge. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) ("We generally presume the jury follows the trial court's instructions in the manner presented."); *Jones v. State*, 264 S.W.3d 26, 29 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see also Vega v. State*, 255 S.W.3d 87, 105 (Tex. App.—Corpus Christi 2007, pet. ref'd) ("[A]ny error was harmless because the [limiting] instruction, which we presume the jury followed, identified material issues for which the evidence

---

[6] We note that in *Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013), the Texas Court of Criminal Appeals clarified that the plurality opinion in *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000) (plurality op.) is not binding authority but may still be persuasive.

22

could be considered under Rule 404(b)," and appellant did not present any evidence rebutting the presumption that the jury followed the trial court's instructions). Thus, we cannot conclude that in this case, the trial court's comments violated appellant's fundamental rights which would have required no objection. *See Unkart v. State*, 400 S.W.3d 94, 101 (Tex. Crim. App. 2013) (finding no fundamental error and that the appellant forfeited his complaint by failing to object, while instructing the jury about the defendant's right not to testify, the judge said, "if I were [charged with a crime], then I think I would probably [would] want to get up and tell my side. It's just my nature. I would want to probably say my point of view on the thing or my version of the facts, but that's just me"). We overrule appellant's final issue.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
GINA BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of January, 2014.

23